Robert Swider OSB #82127 (Local Counsel)
robert@swiderhaver.com
Swider Haver LLP
600 NW Naito Parkway, Suite G
Portland, Oregon 97209
(503) 226-8122
Facsimile: (503) 295-2737

Alan C. Milstein
Sherman, Silverstein, Kohl, Rose & Podolsky, P.A.
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Telephone: 856-662 0700
Facsimile: 856-488-4744
E-Mail: amilstein@shermansilverstein.com
Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### PORTLAND DIVISION

| | | |
|---|---|---|
| Elijah Steward, | | |
| | Plaintiff, | **Case No:** |
| v. | | |
| Applied Genetic Technologies Corporation, and Christine N. Kay, M.D | | **COMPLAINT FOR STRICT PRODUCTS LIABILITY, FAILURE TO WARN, BREACH OF FIDUCIARY DURY, NEGLIGENCE, LACK OF INFORMED CONSENT, and NEGLIGENT HUMAN SUBJECT RESEARCH** |
| | Defendants | |
| | | **DEMAND FOR JURY TRIAL** |

Plaintiff Elijah Steward, by and through the undersigned counsel, Swider Haver LLP and

**PAGE 1 - COMPLAINT**

Sherman, Silverstein, Kohl, Rose & Podolsky, P.A., by way of his Complaint against Defendants Applied Genetic Technologies Corporation and Christine N. Kay, M.D. (collectively "defendants"), hereby says, states, and avers as follows:

## PARTIES

1.  Plaintiff Elijah Steward is a citizen of the state of Maine with an address at 40 Cumberland Rd., Apt 301, Portland, Maine, 04101.

2.  Defendant Applied Genetic Technologies Corporation ("AGTC") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 14193 NW 119th Terrace, Suite 10, Alachua, FL 32615.

3.  Defendant Christine N. Kay, M.D. ("Dr. Kay") is a duly licensed practicing physician in the State of Florida, with an office located at 4340 Newberry Road, Suite 202, Gainesville, FL 32607.

4.  Defendants chose Oregon as the venue where Plaintiff would be dosed in the Clinical Trial. Accordingly, Defendants availed themselves of the laws of the state of Oregon and should have foreseen they could be sued in this District under Oregon's longarm statute.

## I.  NATURE OF THE ACTION, JURISDICTION AND VENUE

5.  This is an action for damages suffered by Plaintiff arising from a clinical trial conducted from 2018 to the present day.

6.  AGTC was the Sponsor of the Clinical Trial and Dr. Kay was the Principal Investigator.

7.  This Court has Jurisdiction over this matter under 28 U.S.C Section 1332 in that the Plaintiff is a citizen of Maine, and the Defendants are citizens of Delaware

**PAGE 2 - COMPLAINT**

and Florida and the amount in controversy exceeds $100,000.

8.    Venue is also proper in this District in that the dosing of Plaintiff in the clinical trial occurred here.

## II.    **FACTS**

9.    Plaintiff was born with the achromatopsia, a genetic eye disease that affects the cells in the retina.  The condition causes Plaintiff's vision to be limited to black and white as well as light sensitivity and reduced visual acuity, which qualifies as legally blind.

10.    In or about August 2018, Plaintiff, a 35-year-old father of toddler twins, met with Dr. Kay to discuss a clinical trial involving patients with achromatopsia.

11.    The Clinical Trial, entitled "A Multiple-Site, Phase 1/2, Safety and Efficacy Trial of a Recombinant Adeno-associated Virus Vector Expressing CNGB3 (rAAV2tYF-PR1.7-hCNGB3) in Patients with Congenital Achromatopsia Caused by Mutations in the CNGB3 Gene," (the "Trial" or "Study") was sponsored, designed and implemented by AGTC to evaluate the safety and effectiveness of a gene transfer drug called rAAV2tYF-PR1.7-hCNGB3 for the possible treatment of achromatopsia.

12.    Mutations in the gene call CNGB3 cause the vision problems experienced by people with achromatopsia.

13.    The experimental drug, rAAV2tYF-PR1.7-hCNGB3 (the "Study Drug"), is an investigational gene transfer product which is designed to deliver a normal copy of the CNBG3 gene in the hopes of allowing the retina to produce a normal CNGB3 protein.

14.    As the title of the Trial reflects, this is a Phase 1/2 trial.  In the FDA process of approval of pharmaceuticals, the first trials of new drugs are labeled "Phase 1: and are intended to explore only whether an experimental drug is safe for use in humans and at what dose.  "Phase

**PAGE 3 - COMPLAINT**

2" trials explore the efficacy at the dose determined to be sage in Phase 1 trials.

15.    Typically, Phase 1 trials involve healthy volunteers and are dose escalation studies unless the drug manufacturer has reason to believe the drug poses a significant chance of serious adverse events which would make the trials unethical if conducted on healthy individuals who would not benefit therapeutically from participation. Thus, for example, new cancer drug trials are typically conducted as Phase1/2 trials and are conducted on cancer patients. Accordingly, in Phase 1 trials, a drug manufacturer like AGTC does not know whether a drug is safe for humans or at what dose, or whether it is effective.

16.    For that reason, preclinical work in the lab and on animals is crucial to determine the universe of potential adverse effects and at what dose.

17.    Also critical is the Informed Consent document, which must spell out the lack of knowledge about the drug and the risks of participation in the trial and must be careful not to represent any promise of efficacy. This is particularly important in gene transfer trials, which are sometimes mistakenly characterized as Gene Therapy, because there have been only a handful of human experiments that have proved even preliminarily that drugs supplied through gene transfer are safe and effective.

18.    Because the delivery method in gene transfer experiments involve the use of millions of particles of a viral vector to deliver the healthy genes or drugs, past gene transfer experiments have a history of not being able to control the subjects' immune response to the viral vector, leading to serious adverse events including death.

19.    The purpose of the Trial at issue thus was to find out whether the Study Drug was safe for patients with achromatopsia.  A copy of the Informed Consent Form is attached as **Exhibit "A."**

**PAGE 4 - COMPLAINT**

20.     According to the Informed Consent Form, AGTC anticipated that up to approximately twenty-eight subjects would be recruited for the Study.  Subjects would have a five-year commitment including twelve visits over the first year and yearly visits for the next four years.  Exhibit A, page 2 of 18.

21.     On information and belief, AGTC and Dr. Kay designed the Trial and wrote the template for the Protocol and the Informed Consent Form.

22.     Prior to August 10, 2018, Defendants emailed the Informed Consent Document to Plaintiff who was in New York. No one associated with the Clinical Trial reviewed the terms of the Informed Consent Form with Plaintiff; instead, Defendants merely requested Plaintiff return it with his signature.

23.     The Informed Consent Form represented that any new information that might affect the decision to remain in the Trial would be provided.  Exhibit A, p. 15 of 18.

24.     The Informed Consent Form identifies certain risks associated with the Study drug and viral vector, including inflammation, decreased vision and infection. Exhibit A, p. 9 of 18.

25.     The section entitled "Risks related to the Study Agent" identifies only a low risk that the Study Drug could spread to the bloodstream, which has happened in another trial involving a similar study drug.  Exhibit A, p. 9 of 18.

26.     While all human subjects would be administered the Study Drug, the Informed Consent Form provided that subjects would be "given one of 3 doses (from lower to higher), depending on when you join the study."  Exhibit A, p. 2 of 18.

27.     While the Informed Consent Form discusses the possibility inflammation, it does not list inflammation caused by a reaction to the viral vector.  It also does not list glaucoma as a potential adverse effect of participating in the clinical trial or that a participant might require an

operation to insert a valve into his body.

28.    The Informed Consent Form did not state that if Plaintiff suffered a serious adverse event, any treatment would need approval by Defendants even it departed from the standard of care and was recommended by Plaintiff's physician. To the contrary, the Informed Consent made specific reference to the participant being able to be treated in accordance with the advice of his personal physician.

29.    The Informed Consent Form also represented that professional medical treatment would be provided in the event of physical injury caused by the Study Drug or Study procedures. Exhibit A at p. 14 of 18.

30.    The Informed Consent Form understated and inadequately explained the risks of participating in the Trial.

31.    Thus, AGTC was misrepresenting to potential human subjects such as Plaintiff the risks of participation in the Clinical Trial. Had Plaintiff been fully informed prior to the procedure that he could suffer a serious adverse event and that his treatment for the event depended on the approval of the Defendants, he would not have agreed to participate.

32.    On or about August 16, 2018, at Casey Eye Institute at Oregon Health Sciences University in Portland, Oregon, Plaintiff was one of the first human subjects to be administered the Study Drug; the procedure involved being placed under general anesthesia and thereafter the gel-like structure inside the eye was removed (vitrectomy) and then the Study Drug was injected under the retina. Exhibit A, p. 7 of 18.

33.    After the surgery, Plaintiff's vision was significantly worse as a result of exposure to the study drug and the vector, he suffered extreme pain and discomfort, and he developed Glaucoma.

**PAGE 6 - COMPLAINT**

34.     Plaintiff was advised that the vector may have been thawed improperly damaging the vector and causing the adverse event.

35.     Plaintiff sought the opinion of a Glaucoma specialist who advised he needed the immediate implantation of a valve to reduce intraocular pressure.

36.     When Plaintiff contacted Dr. Kay, the Principal Investigator of the Clinical Trial, she advised she had to check with Defendant AGTC to see if insertion of the valve would be permitted and later Dr. Kay advised that the Sponsor through its agents advised he could not have the valve implanted.

37.     As time progressed, Plaintiff's eyesight and pain and discomfort worsened.

38.     Ultimately, Defendants advised Plaintiff he could have the valve installed.

39.     As a result of Defendants prolonging the time in which a valve could be installed, plaintiff endured significant pain and discomfort, had two operations, and had deteriorating vision.

40.     Plaintiff's participation in the clinical trial continued up through the spring and summer of 2022 as he had to travel to Wisconsin and Florida to be examined and questioned by Defendants.

## FIRST CAUSE OF ACTION
## STRICT PRODUCTS LIABILITY

41.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

42.     Defendants' gene transfer product coupled with the viral vector was defective and unreasonably dangerous.

43.     As a direct and proximate result of Defendants' actions, Plaintiff was caused to undergo several surgeries and medical procedures and suffered serious pain and discomfort.

**PAGE 7 - COMPLAINT**

44.    As a result of Defendants' actions, Plaintiff has sustained damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
## FAILURE TO WARN

45.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

46.    Defendants failed to warn Plaintiff of the danger of their product and the damage it could cause.

47.    As a direct and proximate result of Defendants' wrongful actions, Plaintiff was caused to undergo several surgeries and medical procedures and suffered serious pain and discomfort.

48.    As a result of Defendants' actions, Plaintiff has sustained damages in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY

49.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

50.    Defendants owed a fiduciary duty to Plaintiff to disclose certain material facts, which include the true risks and dangers posed by their product and the manner in which they conducted their experiment, and to care for Plaintiff in the event he suffered an adverse event as a result of his participation in the clinical trial.

51.    As a direct and proximate result of Defendants' wrongful actions, Plaintiff was caused to undergo several surgeries and medical procedures and suffered serious pain and discomfort.

**PAGE 8 - COMPLAINT**

52.     As a result of Defendants' actions, Plaintiff has sustained damages in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**NEGLIGENCE**

53.     Plaintiff incorporates by reference the above paragraphs as if fully set forth at length herein.

54.     Defendants knew or should have known of the risks of exposure to the study drug coupled with the vector and their dangerous nature prior to commencing the Study.

55.     As the Sponsor and Principal Investigator of the experiment, Defendants had a duty to the Study's subjects to, among other things, design an ethical study, draft a consent form that ensured patient safety, provide subjects, physicians, nurses and study personnel participating in the trial with all necessary information and warnings, implement the trial consistent with the standard of care, and care for plaintiff in the event he suffered and adverse reaction as a result of his participation in the clinical trial.

56.     As the Sponsor and Principal Investigator of the experiment, Defendants had the duty to at all times act in accordance with the standard of care for conducting a clinical trial.

57.     Defendants failed to act in accordance with the standard of care required for a Sponsor and Principal Investigator and otherwise were negligent in the manner in which they conducted the clinical trial and treated Plaintiff once he suffered a serious adverse event.

58.     As the Sponsor and Principal Investigator of the experiment, Defendants had the duty to abide by the regulations set forth in the Common Rule, and to at all times act in the manner which prioritized the safety of the human subjects such as Plaintiff consistent with the standard of care in conducting Human Subject Research.

59.     21 C.F.R. § 312.50 provides as follows "Sponsors are responsible for selecting

**PAGE 9 - COMPLAINT**

qualified investigators, providing them with the information they need to conduct an investigation properly, ensuring proper monitoring of the investigation(s), ensuring that the investigation(s) is conducted in accordance with the general investigational plan and protocols contained in the IND, maintaining an effective IND with respect to the investigations, and ensuring that FDA and all participating investigators are promptly informed of significant new adverse effects or risks with respect to the device.  Additional specific responsibilities of sponsors are described elsewhere in this part."

60.    21 C.F.R. § 312.60 in turn provides as follows: "An investigator is responsible for ensuring that an investigation is conducted according to the signed investigator statement, the investigational plan, and applicable regulations; for protecting the rights, safety, and welfare of subjects under the investigator's care; and for the control of devices under investigation.  An investigator shall, in accordance with the provisions of part 50 of this chapter, obtain the informed consent of each human subject to whom the device is administered… ."

61.    45 C.F.R. § 46.116(a) requires an informed consent document to contain an accurate description of the purposes of research and risks of participation, among other things.

62.    Thus, the study sponsor is obligated to provide the investigator sufficient information about risks and benefits so that informed consent is properly given by the subjects.

63.    The Informed Consent Form was materially misleading and deceptive in a number of respects described above, including that Defendants understated the risks of serious adverse effects from the study device.

64.    The Informed Consent Form drafted by Defendants failed to adequately disclose the risks related to the study drug couple with the vector.

65.    Additionally, on information and belief, Defendants failed to disclose the risks set

**PAGE 10 - COMPLAINT**

forth above to either Plaintiff or his physicians.

66.    Had Plaintiff been fully informed, he would not have agreed to participate.

67.    The aforesaid violations of regulations caused or contributed to Plaintiff's injury.

68.    The injury resulted from the kind of occurrence the regulations were designed to prevent, and Plaintiff was a member of the class of persons the regulations were intended to protect.

69.    By conducting themselves in the manner described above, Defendants caused harm to and/or increased the risk of harm to Plaintiff, thereby causing the injuries and pain and suffering.

70.    As set forth above, Defendants breached their obligations and duties as the Study's Sponsor and Principal Investigator.

71.    As a result of the careless, negligent and reckless conduct of Defendants, Plaintiff was caused to undergo several surgeries and medical procedures, and suffered serious pain and discomfort.

72.    As a result of Defendants' actions, Plaintiff has sustained damages in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**
**LACK OF INFORMED CONSENT**

73.    Plaintiffs incorporate by reference all other paragraphs of the Complaint as if fully set forth herein.

74.    Defendants intentionally, recklessly and/or negligently enrolled Plaintiff in the human subject experiment without properly obtaining his informed consent.

75.    The regulations provide that both investigators and sponsors have a role in obtaining informed consent from study subjects.

**PAGE 11 - COMPLAINT**

76.    As stated above, the Informed Consent Form, was inadequate and materially misleading and deceptive in a number of respects; namely, Defendants understated the risks of serious adverse effects from the study device.

77.    Further, Defendants owed a duty to keep Plaintiff informed of any additional risks it learned from the implementation of the Clinical Trial but it failed to do so.

78.    A reasonably prudent person in Plaintiff's position would not have agreed to participate in the Study if he or she were properly informed.

79.    Had Plaintiff been fully informed, he would not have agreed to participate.

80.    As a direct and proximate result of lack of informed consent, Plaintiff was caused to undergo several surgeries and medical procedures and suffered serious pain and discomfort.

81.    As a result of Defendants' actions, Plaintiff has sustained damages in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
## NEGLIGENT HUMAN SUBJECT RESEARCH

82.    Plaintiff incorporates by reference the above paragraphs as if fully set forth at length herein.

83.    Defendants designed the clinical trial, drafted the clinical trial protocol, drafted the Informed Consent Document, filed the various forms with government agencies seeking permission to conduct the clinical trial and otherwise were involved in the clinical trial from its inception to its conclusion.

84.    Defendants knew or should have known of the risks of participating in the clinical trial prior to commencing research on humans.

85.    As described above, Defendants knew or should have known that participation in the clinical trial posed a substantial and undue risk of causing serious adverse event.

**PAGE 12 - COMPLAINT**

86.    As the Sponsor and Principal Investigator of the clinical trial, Defendants had a duty to the clinical trial's subjects to, among other things, draft a protocol and consent form that ensured patient safety and provided physicians with all necessary information and warnings needed to conduct human subject research properly, to conduct the rial in accordance with the standard of care, and to prioritize the protection of human subjects such as Plaintiff.

87.    21 C.F.R. § 312.50 provides as follows "Sponsors are responsible for selecting qualified investigators, providing them with the information they need to conduct an investigation properly, ensuring proper monitoring of the investigation(s), ensuring that the investigation(s) is conducted in accordance with the general investigational plan and protocols contained in the IND, maintaining an effective IND with respect to the investigations, and ensuring that FDA and all participating investigators are promptly informed of significant new adverse effects or risks with respect to the device.  Additional specific responsibilities of sponsors are described elsewhere in this part."

88.    21 C.F.R. § 312.60 in turn provides as follows: "An investigator is responsible for ensuring that an investigation is conducted according to the signed investigator statement, the investigational plan, and applicable regulations; for protecting the rights, safety, and welfare of subjects under the investigator's care; and for the control of devices under investigation.  An investigator shall, in accordance with the provisions of part 50 of this chapter, obtain the informed consent of each human subject to whom the device is administered… ."

89.    45 C.F.R. § 46.116(a) requires an informed consent document to contain an accurate description of the purposes of research and risks of participation, among other things.

90.    The Informed Consent Form was materially misleading and deceptive in a number of respects described above, including that Defendants understated the risks of serious adverse

**PAGE 13 - COMPLAINT**

effects from participating in the clinical trial.

91.     The Informed Consent Form drafted by Defendants failed to adequately disclose the risks and warnings related to the clinical trial, particularly with respect to the increased risk of glaucoma, and that the adverse events were not reversible.

92.     Had Plaintiff been fully informed, he would not have agreed to participate.

93.     The aforesaid violations of regulations caused or contributed to Plaintiff's injury.

94.     The injury resulted from the kind of occurrence the regulations were designed to prevent, and Plaintiff was a member of the class of persons the regulations were intended to protect.

95.     Plaintiff alleges Defendants were negligent in designing and implementing the clinical trial.  Such negligence included the following departures from the standards in conducting such clinical trials:

     a.     Defendants negligently drafted the protocol and Informed Consent documents governing the clinical trial;

     b.     Defendants negligently designed and implemented the clinical trial;

     c.     The list of risks provided by Defendants to Plaintiff to induce him to participate in the clinical trial was misleading and did not provide all the material information necessary to make an informed decision whether or not to participate in the clinical trial;

     d.     Defendants failed to update Plaintiff as to additional information it learned with respect to the risks associated with the lenses.

     e.     Defendants did not conduct the preclinical work on the study drug to determine the universe of harm before beginning human trials;

**PAGE 14 - COMPLAINT**

f.      Defendants did not provide informed consent consistent with the standards and regulations governing clinical trials;

g.      Defendants did not continually update Plaintiff with respect to the adverse events they knew were occurring in other participants;

h.      Defendants failed to abide by the regulations governing clinical trials;

96.    As a result of the forgoing, Plaintiff suffered extensive damages.

97.    By negligently conducting the clinical trial in the manner described above, Defendants caused harm to and/or increased the risk of harm to Plaintiff, thereby causing the injuries and pain and suffering.

98.    As set forth above, Defendants breached their obligations and duties as designer of the clinical trial and as its Sponsors and Principal Investigator.

99.    As a result of the careless, negligent and reckless conduct of Defendants, Plaintiff was caused to undergo several surgeries and medical procedures and suffered serious pain and discomfort.

100.    As a result of Defendants' actions, Plaintiff has sustained damages in an amount to be proven at trial.

**WHEREFORE**, Plaintiff demands judgment against Defendants jointly and severally as follows:

1.      On each of his Causes of Action for:

A.      General Damages in an amount to be proven at trial;

B.      Special Damages in the sum of in an amount to be proven at trial;

C.      Statutory damages;

D.      Punitive Damages;

**PAGE 15 - COMPLAINT**

E.      Interest;

F.      Costs of suit;

G.      Attorneys' fees; and

H.      All such other relief as the Court deems appropriate.

**Demand for Jury Trial**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands trial by jury in this action for all issues so triable.

Dated: October 24, 2022

                                        **SWIDER HAVER, LLC**

                                        By:/s/ Robert Swider
                                        Robert Swider OSB #82127
                                        Counsel for Plaintiff Elijah Steward

                                        **SHERMAN, SILVERSTEIN, KOHL,**
                                        **ROSE & PODOLSKY, P.A**

                                        By: /s/ Alan Milstein
                                        Alan Milstein, *pro hac vice forthcoming*
                                        Counsel for Plaintiff Elijah Steward

**PAGE 16 - COMPLAINT**

APPROVED
AS MODIFIED
Aug 09, 2018
WIRB®

## Informed Consent Form

| | |
|---|---|
| **TITLE:** | A Multiple-Site, Phase 1/2, Safety and Efficacy Trial of a Recombinant Adeno-associated Virus Vector Expressing CNGB3 (rAAV2tYF-PR1.7-hCNGB3) in Patients with Congenital Achromatopsia Caused by Mutations in the CNGB3 Gene |
| **PROTOCOL NO.:** | AGTC-CNGB3-001<br>WIRB® Protocol #20152509 |
| **SPONSOR:** | Applied Genetic Technologies Corporation (AGTC) |
| **INVESTIGATOR:** | Christine N. Kay, MD<br>4340 Newberry Rd<br>Suite 202<br>Gainesville, Florida 32607<br>United States |
| **STUDY-RELATED PHONE NUMBER(S):** | Christine N. Kay, MD<br>352-371-2800<br>813-500-9725 (24 hours) |
| **STUDY COORDINATOR(S):** | Jing Zhang<br>352-371-2800<br>352-665-6672 (24 hours) |

## PURPOSE:

You[†] have been invited to be in this research study because you have been diagnosed with achromatopsia. Achromatopsia is a genetic eye disease that affects cells in the retina (the lining of the back of the eye that detects light) and causes poor vision, sensitivity to bright light and inability to see different colors.

The purpose of this research study is to test whether a study drug, called rAAV2tYF-PR1.7- hCNGB3, is safe and to see if it can improve your vision and other symptoms of achromatopsia. This will be done by injecting the study drug once into one of your eyes. In order to understand the study, you need to know something about genes.

---

[†] For a parent or guardian of children <18 years of age, "You" means you or your child in this consent form.

Exhibit A

APPROVED
AS MODIFIED
Aug 09, 2018
WIRB®

Genes are located in all cells in your body and are used by cells to make proteins. Achromatopsia is caused by mutations (changes) in any of several genes, including a gene called *CNGB3*. The *CNGB3* gene makes a protein that is needed by cells in the retina that detect light signals. Mutations in the *CNGB3* gene cause the vision problems seen in people with achromatopsia.

The study drug contains a normal copy of the *CNGB3* gene and also contains parts of a virus called Adeno-associated virus (AAV). The AAV virus does not cause illness in humans, and it is used in the study product to help the normal *CNGB3* gene get into cells after the study drug is injected into your eye. This drug is called gene transfer.

The study drug is designed to allow the cells in your retina to make a normal CNGB3 protein. Right now, the study drug is not approved to treat people with achromatopsia because we do not know enough about it.  The drug may only be studied in a research study such as this one.

We plan to have a total of up to approximately 28 people in this study. If you decide to join this study, you will have 12 visits over the first year. After the first year there will be additional visits once a year for the next 4 years.

## PROCEDURES:
You will be asked to come to a hospital or clinic for your visits. If your home is not close to the hospital you will stay at a nearby hotel (costs will be covered by the sponsor). At the first visit you will be examined and have tests done to see if you are eligible to join this study. At the second visit you will have more tests and if these tests are OK you will receive the study drug within the next 7 days. On this day, an eye surgeon will inject the study product under the retina in one of your eyes in a surgical procedure and you will be in the hospital for about half of the day. Everyone who joins the study will get the study drug injected in one eye only. You will be given one of 3 doses (from lower to higher), depending on when you join the study.

After getting the study drug you will be examined and have tests done 1, 7 and 14 days later, and then at 1, 2, 3, 6, 9 and 12 months after getting the study drug. Each of these visits will take at least one full day to complete and it is very important that you can make it to all of these visits.

The types of tests that will be done at the visits during the first year are shown in a table below. More information on the tests is described after the table.

Exhibit A

APPROVED
AS MODIFIED
Aug 09, 2018
WIRB®

| Time relative to study product administration | Screen | Day | | | | | Month | | | | | | Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Base line | 0 | 1 | 7 | 14 | 1 | 2 | 3 | 6 | 9 | 12 | 2-5 |
| Visit Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13-16 |
| Screening exam | ✓ | | | | | | | | | | | | |
| Blood tests | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ |
| Eye exam | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Tests of visual function | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| OCT | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| ERG | ✓ | | | | | | | | | | ✓ | ✓ | ✓ |
| Autofluorescence Imaging | | ✓ | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| Adaptive Optics and AVOT testing (done at site in Wisconsin) | ✓ | | | | | | | ✓ | | | | ✓ | ✓ |
| Fundus photos | | ✓ | | | | | | | | | | ✓ | ✓ |
| Questionnaire | ✓ | ✓ | | | | | | | ✓ | ✓ | ✓ | ✓ | ✓ |
| Study agent administration | | | ✓ | | | | | | | | | | |

After the first year there will be additional visits once a year for the next 4 years.

## Visit 1 – Screening
Visual function tests (visual acuity, reading speed, color vision test, light discomfort test, perimetry, and microperimetry) will be performed on three occasions before study agent administration (with at least one test performed at the screening visit and at least one test at the baseline visit, the third test can be done either at screening or at baseline visit). Additional visual function tests (Advanced Vision and Optometric Tests [AVOT]) will be performed once at screening.  If you are taking part in the natural history study ACHM-001, results from your most recent visit for that study may be used for some of the tests required before the study agent administration. At the Screening visit, a member of the research team will ask about your medical history and the following tests will be done:
- Collection of blood (5 mL, about 1 teaspoon) to test for mutations in the *CNGB3* gene, if this has not already been done.
- Medical history

Exhibit A

APPROVED
AS MODIFIED
Aug 09, 2018
WIRB®

- Visual acuity: You will be asked to look at a computer screen and tell the study staff the name of the letter that is on the screen. This test takes approximately 30 minutes.
- Reading speed: This test measures how quickly you are able to read words of different sizes. A card with different size print will be shown to you and you will be asked to read each line as quickly but as accurately as you can. This test takes about 20 minutes.
- Color vision tests. You will be asked to arrange a series of colored caps in order, and you may be asked to use a machine to match colors in two parts of a screen. This will take about 30 minutes. You also may be asked to look at moving colored squares on a computer screen and describe their movement. This test takes approximately 20 minutes.
- Visual field test. You will be asked to look at a light in the center of the screen and be given a button to press. A computer then shines a different light on other parts of the screen and you will click the button whenever you see a light. This test takes about 2 hours.
- Microperimetry: This is another test in which you will be asked to look at a light in the center of the screen and press a button whenever you see a light. You will be given drops to dilate your eyes if your eyes are not dilated from previous tests. The test takes about 30 minutes.
- Light discomfort test. You will be asked to look at a light source and the light intensity will be increased until you say STOP when the light intensity makes you uncomfortable. This test will take about 30 minutes.
- Optical Coherence Tomography (OCT): You will be asked to look at a screen while pictures are taken of the back of your eye. We will put drops in your eyes to dilate your eyes if your eyes are not dilated from previous tests. This test takes about 30 minutes.
- Electroretinogram (ERG): This is a test that measures the electrical activity of your retina. Drops will be put in your eye to dilate and numb your eye and a special contact lens will be placed on your eye. Lights of different colors and strengths will then be flashed on a screen in front of you. This test takes about 60 minutes.
- Eye exam: You will be asked questions about your vision and the research doctor will use instruments to look through the front of the eye to see your retina (the back of your eye) and other parts of your eye and measure the pressure in your eye. You will be given drops that dilate your eyes for this exam. This test takes about 30 minutes.
- Questionnaires: You will be asked a series of questions about how your vision affects your life. This takes about 20 minutes.

Exhibit A

APPROVED
AS MODIFIED
Aug 09, 2018
WIRB®

- Adaptive Optics Retinal Imaging: This is a special test that will be performed at the Medical College of Wisconsin. We will use a device called an "Adaptive Optics Ophthalmoscope." This device will allow us to see the photoreceptor cells in your retina. Nothing will touch your eye and you will be asked to either place your chin on a chin-rest and forehead in a forehead-rest or to bite on a custom dental impression on a bite bar. This test takes about 4 hours. You may also have color vision and light discomfort tests done at this visit. During each session you will have drops placed in your eyes to dilate your pupils.
- Advanced Vision and Optometric Tests (AVOT): (not performed at all clinical sites)
  - CAD / ACAD (Colour Assessment and Diagnosis / Achromatopsia Colour Assessment and Diagnosis) testing: These are tests of color vision. You may be asked to look at moving colored squares on a computer screen and describe their movement. This tests takes about 20 minutes.
  - Acuity-*Plus* testing: This test measures spatial vision and functional contrast sensitivity. You may be asked to wear specially calibrated glasses and to identify letters and patterns on a computer screen. This test takes about 20 minutes.
  - Flicker-*Plus* testing: This test measures the sensitivity of your rod and cone cells. You may be asked to wear specially calibrated glasses and to identify stimuli as they are presented to you on a computer screen by pushing a button. This test takes about 20 minutes.
- At this visit or at the Baseline Visit depending on the scheduling of these visits, you may be given steroid medication or a prescription for a steroid medication and may be given an oral antiviral medication or a prescription for an oral antiviral medication which you will start taking by mouth prior to the study drug administration day. Your doctor may decide to give you the steroid medication by injecting it into (intravitreal) or around/behind (subtenon) your eye. You may also be given additional doses during follow-up visits, if your study doctor thinks that this is needed. Steroids are given to reduce the chance of having eye inflammation which may occur after the study drug administration and antivirals are given to prevent the development of an infection because of use of the steroid medication. Study staff will give you the proper instructions for the use of these medications and how long they should be taken.

Exhibit A

APPROVED
AS MODIFIED
Aug 09, 2018
WIRB®

## Visit 2 – Baseline

At this visit, the following tests will be done:

- Adverse event review. You will be asked whether you have had problems related to any of the study procedures that were done or medications taken.
- General health evaluation and physical evaluation
- Collection of blood (60 mL, about 12 teaspoons) to test your blood counts, your liver and kidney function, and tests of your immune system
- Pregnancy test (if you are a female that is able to get pregnant)
- Visual acuity
- Eye exam
- Reading speed
- Color vision tests
- Visual field tests
- Microperimetry
- Light discomfort test
- OCT
- ERG
- Fundus photos. Photographs will be taken of the back of your eye. We will give you drops that dilate your eyes for this test. This test takes about 15 minutes.
- Autofluorescence: This is a test that takes a picture of the back of your eye. We will give you drops that dilate your eyes for this test. You will be asked to look at a screen while pictures are taken of the back of your eye. This test takes about 15 minutes.
- Questionnaires

## Visit 3 – Study Agent Administration

You may be asked to go to another study site to have the study agent administered. If you do this, you will be asked to sign a separate consent form for the surgery at the surgical site. You may also be asked to undergo a pre-operative physical exam and provide your age, ethnicity, race, medical history, and medication list to make sure that it is safe for you to have surgery. Some additional testing, including an ophthalmic examination and non-invasive imaging of your eyes may be repeated at the surgical site so that the surgeon has all of the information needed to perform your surgery. You will meet with the surgeon before the surgery and any questions that you may have about the surgery will be answered. You will likely remain at the surgical site for up to 2 weeks of follow-up or more if the surgeon thinks it is needed for your safety.

Exhibit A

APPROVED
AS MODIFIED
Aug 09, 2018
WIRB®

At this visit, you will get the study product injected in one eye by a procedure called vitrectomy and sub-retinal injection.

You will be taken to an operating room where a retinal surgeon will remove the gel-like structure inside your eye (vitrectomy) and then inject the study drug under the retina in one eye using standard surgical methods. The retinal surgeon may place fluid or gas inside your eye and may ask you to maintain a specific head and body position, such as lying on your back or side or face down, after the surgery and then when you are sleeping for a period of time. This period may be at least 1 hour or more depending on the procedures done during the surgery. Before and during the injection you will be given medications (anesthesia) to prevent you from having any pain. Depending on your age and the advice of the surgeon, this will be either local anesthesia plus medications given into one of your veins, or general anesthesia. Detailed information about the type of anesthesia will be given to you on the day before the injection. Before and during the surgery you may also be given medications to reduce eye inflammation and reduce the chance of an infection. Detailed information will be given to you when these medications are prescribed. After the study product is administered, you will be given other medications, such as eye drops, ointments or small injections around the eye and your eye will be covered with a patch. You will be examined several times over the next several hours to check the pressure inside your eye and to check your vital signs (heart rate, breathing rate, blood pressure and temperature).

**Follow-up visits – Days 1, 7 and 14 and Months 1, 2, 3, 6, 9 and 12**
At these follow-up visits you will repeat many of the same procedures that were done at visit 1 and visit 2. During the follow-up visits your doctor may choose to conduct glucose checks while you are taking steroids. At each visit you will have a general health evaluation, an eye exam and a visual acuity test. At most visits you will also have blood tests (up to 8 ½ teaspoons, depending on visit), tests of reading speed, color vision, visual fields, light discomfort, microperimetry and OCT. You will have an ERG done at the 6 and 12 month visits. You will have the autofluorescence imaging done at Day 7 and 14 and Months 1, 2, and 3. You will complete questionnaires at the 1, 2, 3, 6, 9 and 12 month visits.

At 3 and 12 months after getting the study drug, you will also go to the Medical College of Wisconsin to have the adaptive optics imaging test, color vision, light discomfort, and AVOT testing.

Exhibit A

APPROVED
AS MODIFIED
Aug 09, 2018
WIRB®

## Long-Term Follow-Up (LTFU)

During the next 4 years after the Month 12 visit, you will have follow-up visits once a year. At each of these visits you will have a blood test (5 mL, about 1 teaspoon) and a member of the research team will ask about any changes in your medical history, perform an examination to evaluate those changes, and perform an eye examination, tests of visual acuity, reading speed, color vision, light discomfort, visual fields, OCT and questionnaires. You may also have an ERG and microperimetry done at these visits. You may also be asked to go to the Medical College of Wisconsin to have some testing done including the adaptive optics imaging, color vision, light discomfort, and AVOT testing.

If you have any questions during the long-term follow-up period, call the study staff listed under the contact information on this informed consent form.

To make sure you can be reached during the long-term follow-up, you will be asked to provide a current address and telephone number. You or your parent/guardian will be told about any important findings from the study including new information about the experimental procedure, the harms and benefits experienced by other people in the study, and any long-term effects that have been seen.

## Early Termination Visit

If at any time during your participation in this study, either you or the study doctor decides you should stop participating in the study, you should return to the study center for an early termination visit. At this visit you will have a blood test (up to about 10 teaspoons, depending on when you decide to stop the study) and a member of the research team will ask about any changes in your medical history, perform an examination to evaluate those changes, and perform an eye examination, tests of visual acuity, reading speed, color vision, light discomfort, visual fields, OCT, and questionnaires. You may also have an ERG, autofluorescence imaging and microperimetry done at this visit. You may also be asked to go to the Medical College of Wisconsin to have some testing done including the adaptive optics retinal imaging, light discomfort, color vision and AVOT testing.

## RISKS AND DISCOMFORTS:

Possible risks related to your being in this study are those related to the study drug, risks related to the procedures to administer the study product, and risks related to other study procedures.

Exhibit A

APPROVED
AS MODIFIED
Aug 09, 2018
WIRB®

**Risks related to the Study Agent**

Potential risks include possible long-term problems that could occur years after the injection. The study product has been tested in animals with no serious problems, but tests in animals do not always predict how people will respond.

Seven subjects have received the study drug since the beginning of the study (May 2016). All subjects have had mild or moderate eye inflammation which has been treated with steroids and resolved. Five of the seven subjects have had no change in vision from baseline as of their most recent visit. Two of the seven subjects (the first two treated in the study) have had a decrease in vision from baseline. This finding may be related to the surgical procedure, study drug, or other patient-specific factors. Because the number of patients treated is small, all of the risks are not entirely known. Your doctor will discuss these subjects in more detail with you and answer any questions you have.

There is a chance that you could develop an immune response to the study drug that could cause inflammation (redness, pain and swelling) in your eye, which may make your vision worse or cause the study drug not to be effective.

There is a possibility that the study product may spread to the bloodstream. A similar study drug, containing parts of an AAV virus and a gene for a different eye disease, was injected underneath the retina. In those studies, the frequency of the study drug spreading to the bloodstream was low and lasted for less than a few weeks after the injection. The risk of the rAAV2tYF-PR1.7-hCNGB3 study drug spreading to the bloodstream is considered to be low.

If you are pregnant or breastfeeding, you must not be in the study because we do not know how the study drug could affect a fetus or infant.

In some other gene transfer studies, precautions against pregnancy in the study participant or partner of a study participant were recommended. Since the dose of study drug given in this study will be low and there is low risk of study drug spreading to the bloodstream, the chance of having an effect on future pregnancies is not considered to be a reasonable possibility. Therefore, no precautions related to a participant's partner becoming pregnant are recommended.

There is a potential risk that subjects will develop antibodies to CNGB3 protein, and at this time it is not clear how this could affect you or your health.

You may also have some side effects we do not expect because we are still learning about the study drug.

Exhibit A

APPROVED
AS MODIFIED
Aug 09, 2018
WIRB®

**Risks related to the procedures to administer the study product**
There is a risk that you may have inflammation (redness, pain and swelling) or infection around your eye after the surgery. Before and after the eye surgery when you are given the study drug, you may be given medications to reduce eye inflammation and reduce the chance of an infection. Most infections can be treated but vision may get worse even with treatment, and a severe infection could lead to severe loss of vision or blindness.

Retinal surgery may cause blurred vision shortly after surgery. There is also a risk of loss of central and peripheral vision, infection, development of a blind spot, eye pain, retinal tears, macular hole, retinal detachments or cataracts (clouding of the lens in your eye) that could require additional eye surgery.

Bleeding in the eye is rare in people without a bleeding tendency. Small amounts of bleeding could occur in different parts of the eye and this usually gets better without treatment. Large amounts of bleeding may require surgical drainage.

Your cornea could be scratched during the surgery. Scratches on the cornea usually get better without treatment but may require patching or a bandage contact lens.

An increase or decrease in the pressure inside your eye could occur for a short time after surgery but this can be treated with medications, if needed. Also, some medications used before or after surgery may increase eye pressure.

All of these risks related to the surgical procedure could result in worsening of vision.

Risks associated with intravitreal injection of any product include the potential for pain, bleeding, or swelling in the eye, infection, retinal detachments or cataract development that could require additional eye surgery. Infection that may occur after intravitreal injections can usually be treated with antibiotics. All of these complications could result in worsening of vision.

There is also a low risk of complications from anesthesia. There is a small risk of the needle entering the eye or the major nerve in the eye during injection of local anesthesia. General anesthesia may also be associated with nausea or low blood pressure. Rare complications from general anesthesia include prolonged unconsciousness, drowsiness or disorientation, fast heartbeat, pneumonia or death.

Exhibit A

APPROVED
AS MODIFIED
Aug 09, 2018
WIRB®

There is a risk that the surgeon may be unable to deliver the study agent to the intended area (i.e. underneath the retina) because of differences in individual's eyes which cannot be identified prior to surgery. One of the seven subjects treated to date did not receive the study agent under the retina as intended.

**Risks related to treatment with steroid and antiviral medications**
The most common risks associated with applying steroid medication into (intravitreal injection) or around (topical or subtenon) the eye include increased pressure within the eye, infection, and cataract formation. Steroids applied in or around the eye may also cause blurred vision, temporary burning or stinging, itching or eye pain. All risks described in the intravitreal injection of the study drug apply for intravitreal and subtenon applications of the steroids.

The most common risks associated with taking steroid medication by mouth include high blood pressure, increased glucose level or worsening of glycemic control in patients with existing diabetes, laboratory abnormalities (including increased white blood cell count), increased appetite and weight gain. Other risks include infection (for example, herpetic infection), gastrointestinal upset/bleeding, aggression, anxiety, blurred vision, dizziness, headache, mood changes, facial and body hair growth, bone loss, numbness or tingling in the arms or legs, shortness of breath, swelling of the fingers, hands, feet, or lower leg, flushed, dry skin, bone fracture, heartburn or indigestion, nausea, and sleeplessness. These side effects are generally associated with long-term steroid use. Taking steroid medication by mouth may also lead to short stature in children.

The most common risks associated with the use of antiviral drugs include headache, nausea and/or vomiting, diarrhea, rash, muscle or joint aches, fatigue, and elevation of liver function tests or kidney tests. Other risks include anxiety, loss of appetite, and in rare instances may cause agitation, confusion, hallucinations, seizure, tremor, and changes in your red blood cells or platelets. These side effects are more likely if you are elderly, already have kidney disease, are dehydrated, are taking other drugs that may affect your kidneys, or are severely immunocompromised.

**Risks Related to other study procedures**
*Eye Exams*: At each visit the investigator will perform an eye exam. Your pupils will be dilated and will remain dilated for 4 to 6 hours. This may cause your vision to be blurry, and you may be more sensitive to bright lights. Sunglasses with UV protection should be worn.

Exhibit A

APPROVED
AS MODIFIED
Aug 09, 2018
WIRB®

*Drops for Pupil Dilation:* Rarely people may have redness, discomfort or allergic reactions to the drops used to dilate the pupil during eye tests. This is usually not serious and can be treated if necessary. Bright lights may be uncomfortable while the pupil is dilated, but this can be relieved by wearing sunglasses. The drops may also cause high blood pressure, abnormal heart beating, or some types of glaucoma to worsen, but these can be treated. In rare cases, the drops can cause high pressure in the eye that needs immediate attention. If this side effect occurs it can be treated. Your eyes will be dilated for the eye exam, in one of the light discomfort tests, microperimetry, fundus photography, OCT and ERG.

*Optical Coherence Tomography (OCT):* OCT is non-invasive and is not painful. No side effects from this test have been reported. Your eyes will be dilated for this procedure.

*Fundus Photography:* There are no known risks associated with this procedure. The bright light flashes used to take the photos may cause momentary discomfort but will not harm your eyes.

*ERG:* During the ERG test, a special contact lens is placed over your eye after drops are given that numb the eye. Scratches on the cornea might be caused by the contact lens or by rubbing your eye while it is still numb. The investigators will remind you not to rub or touch your eyes after the ERG. Your eyes will be dilated for this procedure.

Scratches to the cornea (eye surface) may result from the contact lenses used in performing electroretinography testing.

*Visual Fields, Microperimetry, and AVOT:* During these tests, you will have to sit still and look straight ahead at one spot for several minutes at a time. You may feel some fatigue or discomfort during the test, but the test will not harm your eyes.

*Blood drawing:* Risks associated with blood drawing include local pain/discomfort, bruising, infection or fainting.

*Adaptive Optics Test;* The adaptive optics test in this study is done for research purposes only, and is not the type used for the purpose of diagnosis, clinical evaluation or treatment. It will not be fully reviewed for all types of abnormalities. However, sometimes the research investigators may find something in the retinal images that could be abnormal or unexpected. From past experience, this happens about 1 in 1,000 times, where something is

APPROVED
AS MODIFIED
Aug 09, 2018
WIRB®

noticed that could be abnormal and the patient or doctor was not aware of this. If this should occur and the research investigators feel you need another type of retinal imaging to make a diagnosis, or an eye exam that would be used as a basis for diagnosis and treatment, they can tell you about this. **It is your choice if you want them to inform you of any potentially abnormal finding.** Please initial here whether you want us to inform you of any potentially abnormal finding:

Yes, I want to be informed of a potentially abnormal finding in my retinal images.

I understand that these images are not done for the purpose of diagnosis, and such findings do not necessarily mean that there is anything wrong, only that it would be reasonable to have a qualified eye-care professional examine me further. Such examinations and tests would be my responsibility to schedule and pay for. The research investigators can provide names of qualified eye-care professionals experienced in performing such exams, or you can choose your own eye-care professional. If you have any questions about what might be considered an abnormal finding, please feel free to discuss this with the study staff.

No, I do not want to be informed of a potentially abnormal finding in my retinal image

## BENEFITS:
You may or may not personally benefit from being in this study. However, by serving as a subject, you may help us learn how to benefit patients in the future.

## ALTERNATIVES TO PARTICIPATION IN THIS STUDY:
Since participation in this study is voluntary, you may choose not to participate in this study. There are no drugs approved for treatment of achromatopsia.

## CONFIDENTIALITY:
The investigators and other persons involved in the study will make every attempt to maintain the confidentiality of the personal health information collected for the study. We will not use your name or your identity for publication or publicity purposes, and we will make certain that you are not identified in any photographs.

APPROVED
AS MODIFIED
Aug 09, 2018
WIRB®

Reporters from newspapers, radio and television may be interested in learning about this research study. We will make efforts to protect you from unwanted contact from news reporters.

Research records may be reviewed and/or copied by the sponsor (AGTC) and/or their representatives, the surgical site (if you are sent to a different site other than your "home site" to have the study agent administration), the committees that review the study to make sure it follows government regulations, the US Food and Drug Administration (FDA), and other agencies that regulate clinical trials. Because the study involves gene transfer, safety information is required to be reported to the Recombinant DNA Advisory Committee (RAC) of the National Institutes of Health (NIH). This safety information is available to the public but will not include your name or your identity. At each site the information may be reviewed by the Institutional Review Board and the Institutional Biosafety Committee.

## COSTS:
Neither you nor your health insurance company will be charged for any tests or procedures performed as part of this research study. The study drug will be provided without charge. However, you or your health insurance company will be billed for medical care costs (including the need for cataract surgery should that need arise) incurred during the course of this study if you would have incurred these costs if you did not participate in this study.

You will be reimbursed for reasonable costs related to your travel to attend the study visits, but you will not be paid for being in this study. You will have the option to use Clincierge, a travel assistance company to help you plan your travel. Additional information on this service will be provided by your home site.

## COMPENSATION FOR INJURY:
If you have a medical emergency during the study, you may contact the investigator or any member of the study team. You may also contact your regular doctor, or seek treatment at a local medical facility. Be sure to tell the doctors who treat you that you are in a research study, and ask them to contact the investigator for further information and instructions.

If you have any physical injury caused by the study drug or study procedures, professional medical treatment will be provided to you at the clinical trial site where the procedures were performed, but no other financial compensation is available. If you have an illness or injury during the study that is not caused by the study product or study procedures, you or your insurance company will be responsible for the cost of medical care for that illness or injury.

APPROVED
AS MODIFIED
Aug 09, 2018
WIRB®

<u>If you are injured as a result of this study, you do not give up your right to pursue a claim through the legal system.</u>

## PARTICIPATION:

You do not have to join this or any research study. If you do join, and later change your mind, you may quit at any time. If you refuse to join or withdraw early from the study, there will be no penalty or loss of any benefits to which you are otherwise entitled.

You may be removed from the study without your consent for any of the following reasons:

- You do not follow instructions from the investigator, such as failing to return for follow-up visits
- The investigator decides that removal from the study is in your best interest
- The study is stopped for any reason, such as a decision by the Sponsor or the FDA

If you withdraw from the study voluntarily, or if you are removed from the study without your consent, you may be asked to provide additional blood samples, or have additional tests performed, if the investigator thinks this would be in your best interest, such as to evaluate an adverse event that has not yet resolved. The data and specimens gathered during your study participation prior to you withdrawal will continue to be used by the sponsor until all worldwide regulatory obligations have been met.

Ocular fluids collected incidentally in the study may be stored and tested.

The Sponsor (AGTC) may need to re-analyze the data from this study at a later date, and may need to carry out extra tests on samples collected during the study or perform further statistical tests on the data. The results of this study may be used for future medical research.

If the investigator becomes aware of any new information during the course of this study that might affect your decision to remain in the study, you will be informed of this information.

## CONTACT INFORMATION:

If you have any questions, concerns, or complaints regarding this research study, you may contact the investigator: Christine N. Kay, MD at 352-371-2800 or 813-500-9725 (24 hours).

APPROVED
AS MODIFIED
Aug 09, 2018
WIRB®

If you have any questions regarding your rights as a research subject or if you have questions, concerns, or complaints about the research, you may contact: Western Institutional Review Board® (WIRB®) 1019 39th Avenue SE Suite 120, Puyallup Washington 98374-2115, Telephone: 1-800-562-4789 or 360-252-2500, E-mail: Help@wirb.com. WIRB is a group of people who perform independent review of research. WIRB will not be able to answer some study-specific questions, such as questions about appointment times. However, you may contact WIRB if the research staff cannot be reached or if you wish to talk to someone other than the research staff.

In the event of a research-related injury, you may contact: Jing Zhang at 352-371-2800 or 352-665-6672 (24 hours).

A description of this clinical trial will be available on http://www.ClinicalTrials.gov, as required by U.S. Law. This Web site will not include information that can identify you. At most, the Web site will include a summary of the results. You can search this Web site at any time.

Exhibit A

APPROVED
AS MODIFIED
Aug 09, 2018
WIRB®

## DOCUMENTATION OF INFORMED CONSENT:

I have read (or had read to me) the above information and it has been orally summarized for me. My signature indicates that:

- I understand the information that has been given to me,
- I have been given full opportunity to ask questions to obtain further information,
- All of my questions have been answered to my satisfaction,
- I have no further questions at this time.

### Consent and Assent Instructions:

Consent:    Subjects 18 years and older must sign on the subject line below
For subjects under 18, consent is provided by the parent or guardian

Assent:    Verbal assent, if possible, for subjects 6 through 11 years old
Written assent is required for subjects ages 12 and over using the Assent section below.

Elijah Steward
_____
Subject Name (printed)

## CONSENT SIGNATURE:

_____    8/10/18_____
Signature of Subject (18 years and older)    Date

_____    _____
Signature of Parent or Guardian    Date
(when applicable)

_____    8-10-18_____
Signature of Person Conducting Informed    Date
Consent Discussion

Exhibit A

APPROVED
AS MODIFIED
Aug 09, 2018
WIRB®

## ASSENT SECTION:

Statement of person conducting assent discussion:

- I have explained all aspects of the research to the subject to the best of his or her ability to understand.
- I have answered all the questions of the subject relating to this research.
- The subject agrees to be in the research.
- I believe the subject's decision to enroll is voluntary.
- The study doctor and study staff agree to respect the subject's physical or emotional dissent at any time during this research when that dissent pertains to anything being done solely for the purpose of this research.

_____     Date

Signature of Person Conducting
Assent Discussion

Signature of Minor Subjects:
This research study has been explained to me and I agree to be in this study.

_____     Date          Age (years)

Subject's Signature for Assent

Statement of Parent or Guardian:

My child appears to understand the research to the best of his or her ability and has agreed to participate.

_____     _____

Signature of Parent or Guardian              Date